Daniel J. Wadley (10358)
wadleyd@sec.gov
Amy J. Oliver (8785)
olivera@sec.gov
Alison J. Okinaka (7954)
okinakaa@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, Utah 84101
Tel. 801-524-5796
Fax: 801-524-3558

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> PLAINTIFF, <br><br> v. <br><br> THE FALLS EVENT CENTER, LLC and STEVEN L. DOWN, an individual, <br><br> DEFENDANTS. | **COMPLAINT** <br><br> Case No.: 2:18-cv-00382-PMW <br><br> Magistrate Judge: Paul M. Warner |

Plaintiff, Securities and Exchange Commission (the "Commission"), for its Complaint against defendants The Falls Event Center, LLC ("The Falls") and Steven L. Down ("Down") (collectively, "Defendants") alleges as follows:

**INTRODUCTION**

1. This matter arises out of misrepresentations in the offer or sale of securities by The Falls and Down, its CEO and founder. Down has raised approximately $120 million from approximately 300 investors for The Falls since 2011.

2. The Falls builds and operates small event centers that can be rented for events such as parties and weddings. Currently The Falls has eight open and operating event centers in five states.

3. The Falls offers several investment options to prospective investors. Most investors have invested in The Falls' convertible secured promissory notes (the "Notes"). The investments offered by The Falls, including the Notes, are securities.

4. Down has solicited investments in The Falls by, among other things, making presentations to groups of prospective investors during continuing education seminars that he sponsors for dentists.

5. In his presentations Down consistently represented that some or all of the event centers were and continued to be profitable. Certain of Down's representations concerning the individual event centers were untrue, however. The Falls' own accounting records indicate that, from inception through September 2017, the event centers have never been profitable on the basis of generally accepted accounting principles ("GAAP").

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction by authority of Sections 20 and 22 of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77t and 77v]. Defendants, directly and indirectly, singly and in concert, have made use of the means and instrumentalities of interstate commerce and the mails in connection with the transactions, acts and courses of business alleged herein, certain of which have occurred within the District of Utah.

7. Venue for this action is proper in the District of Utah under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], because certain of the transactions, acts, practices, and

courses of business alleged in this Complaint took place in this district and because Defendants reside in and transact business in this district.

8. Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged herein and in transactions, acts, practices, and courses of business of similar purport and object.

9. Defendants' conduct took place in connection with the offer or sale of investments, including Notes, issued by The Falls, which are securities.

## DEFENDANTS

10. The Falls Event Center, LLC is a Utah limited liability company with its principal office in West Jordan, Utah. It was formed by Down in 2011. The Falls opened its first event center in St. George, Utah in the fall of 2013. Its most recent center was opened in McMinnville, Oregon in March 2017.

11. Steven L. Down, 60, is a resident of Draper, Utah. Down is the CEO of The Falls. From 2011 to the present, Down offered and sold investments to individuals either individually or through his entity The Falls.

## STATEMENT OF FACTS

12. Down formed The Falls in 2011 as a Utah LLC.

13. Down is the CEO of The Falls. He directs The Falls' operations and makes decisions regarding how The Falls raises and spends investor funds.

14. The Falls opened its first event center in the fall of 2013 and currently has eight open and operating event center locations. The Falls typically purchases the land and constructs the event centers itself. The Falls also owns approximately 13 parcels of vacant land on which it plans to build new event centers.

15. The currently open and operating locations are in Salt Lake City and St. George, Utah; Elk Grove, Fresno and Roseville, California; Littleton, Colorado; McMinnville, Oregon; and Gilbert, Arizona.

16. The purchase and construction of the event centers is and has been financed through loans made by private investors, bearing interest rates of 10 to 14% per year. The Falls referred to these loans as "hard money" loans. The Falls obtained hard money loans because it was not able to obtain traditional bank financing at lower interest rates.

17. The hard money loans are secured by mortgages on the event centers. As of September 30, 2017 the principal amount of these loans was $33.5 million.

18. Down has located prospective investors by presenting his sales pitch for The Falls at continuing education seminars that he sponsored for dentists. During the seminar lunch break, Down gave his presentation regarding an investment in The Falls. Down's presentation, and the accompanying PowerPoint, has remained essentially the same for years.

19. In his presentation, Down always represented that many if not all of the event centers were profitable even before they opened, because they were accepting event bookings before they opened. Down represented that that the event centers continued to be profitable after they opened. Down represented to investors that, after The Falls had 12 centers, it would be able to obtain institutional loans to replace the hard money loans.

20. In his presentation, Down always stated that The Falls would have 200 event centers by 2022. He always represented that each event center would earn gross revenue of $1 million per year and cover expenses of approximately $650,000, leaving profit of approximately $350,000, or 35%, per year.

21. In his presentation, Down always stated that therefore the 200 projected centers would bring in net income of $70 million per year, and that The Falls would achieve a price/earnings ration of 40, causing it to be worth $2.8 billion by the time it has 200 centers in 2022. He always forecasts that, after 2022, the company will either go public or be bought out.

22. Prospective investors were often flown to Salt Lake City or to one of the other event centers, and given an opportunity to meet the executive team of The Falls. They were provided with the company's private placement memorandum, its current Business Plan Summary and its most recent quarterly investor newsletter.

23. Investors usually invested in The Falls' Notes. As of September 30, 2017 The Falls had approximately $78 million in Notes outstanding. As of that date, accrued interest expense related to these Notes on the company's profit and loss statement was nearly $2 million.

24. After investing, investors did not receive any updated disclosures from The Falls other than a quarterly investor newsletter that often included a letter from Down on recent events.

25. The Falls maintained its books using QuickBooks software, which generates financial statements in accordance with GAAP. Beginning in approximately 2011, The Falls' chief financial officer ("CFO") provided Down with reports each month that included GAAP profit and loss statements for the individual event centers.

26. In 2014, Down and other company executives decided to generate a new type of monthly profit and loss statement for the event centers, using the figure for event bookings instead of the GAAP revenue figure. They called these statements "modified accrual" profit and loss statements.

27. Accordingly, at the direction of Down and the other executives, the CFO began preparing monthly profit and loss statements using bookings instead of GAAP revenue.

28. The CFO e-mailed these statements in internal reports to Down and other executives almost every month from 2014 until the CFO left the company in March 2017.

29. In his presentations to investors, Down did not disclose that The Falls was using "modified accrual" profit and loss statements.

30. In the first half of 2016 the CFO attended an investor presentation by Down. After hearing the presentation he told Down that Down had to stop telling prospective investors that the centers were making a profit, because they were not doing so.

## MATERIAL MISREPRESENTATIONS AND OMISSIONS

31. In a newsletter The Falls sent out between January and August 2014, Down stated: "The Falls at St. George is now profitable and gaining momentum. A monthly return on revenue of 35% is looking possible sometime this year!" According to The Falls' QuickBooks, however, St. George experienced a net operating loss in every month but one from January to August 2014. Over this period St. George had a net operating loss of $81,531. According to the "modified accrual" P&Ls, from January to August 2014, St. George had a net operating loss of $57,035, with only three out of eight months showing net profit.

32. In a letter to investors included in an October 2015 investor newsletter, Down stated, "[w]e currently have five event centers operating; each one operating profitably." These five would have been St. George, Elk Grove (two buildings) and Fresno (two buildings). Through September 2015, however, QuickBooks shows that St. George lost $104,757; Elk Grove lost $657,261; and Fresno lost $102,682. On a "modified accrual" basis, this statement is false as to St. George and Elk Grove.

6

33. Between February 2016 and December 2016, Down told four investors that the centers were profitable. On a GAAP basis, for the 2016 year, however, the company's QuickBooks reflects that all centers had net losses. On a "modified accrual" basis, for the 2016 year, only two out of the eight centers were profitable.

34. In a presentation to a group of investors in January 2017 in Seattle, Down stated: ". . . we went into Elk Grove and built these two buildings. These two buildings were profitable in month one. We're getting about 35 percent return this year." On a GAAP basis, and even on a "modified accrual" basis, Down's claim that Elk Grove was "profitable in month one" was incorrect. Elk Grove opened in November 2014. For its first month, its net loss was $114,268. In its second month, its net loss was $84,186. On a "modified accrual" basis, Elk Grove lost $67,689 in its first month and lost $52,813 in its second.

35. In March 2017, Down told an investor that "the Fresno buildings were profitable in the first month." On a GAAP basis, this statement is incorrect. Fresno opened in August 2015. In its first month, its net loss was $52,434. Only on the "modified accrual" basis is this statement correct. On that basis Fresno had net income of $12,914 in its first month.

### DOWN'S NEGLIGENCE

36. Down was at least negligent in making representations to investors regarding the profitability of individual event centers. Down was the CEO of The Falls and had ready access at all times to all its financial information. In fact, profit and loss information was regularly provided to him by executives at The Falls.

37. From the inception of The Falls until at least 2014, The Falls' CFO provided Down with a QuickBooks profit and loss statement for the event centers, prepared on a GAAP basis.

38. Beginning in 2014 and continuing until March 2017, The Falls' CFO provided Down with "modified accrual" profit and loss statements for the event centers by e-mail every month.

39. From the first half of 2016 forward, Down was informed on numerous occasions by members of his executive team at The Falls that the event centers were not profitable. They informed Down that the centers were not close to achieving $1 million in annual gross revenue or 35% profit per center, as Down was representing to investors. They informed Down that his event center model was unsustainable because of the huge amount of mortgage debt on the event centers and because of the tens of millions of dollars of Note principal and accrued interest.

40. Down was at least negligent in not reviewing, or assimilating, the profit and loss information provided to him by The Falls' CFO, while continuing to make false representations to investors that the event centers were profitable.

41. In his presentations to investors, Down did not disclose that The Falls was using "modified accrual" profit and loss statements. Down was at least negligent in not making these disclosures to investors.

42. Either the GAAP profit and loss statements or the "modified accrual" profit and loss statements would have shown Down that he was mistaken in touting the profitability of the event centers in the course of raising money from investors.

**FIRST CAUSE OF ACTION
FRAUD IN THE OFFER OR SALE OF SECURITIES
Violations of Sections 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)]
by The Falls and Down**

43. The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 42 above.

44. Defendants, by engaging in the conduct described above, directly and indirectly, in the offer and sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

45. By reason of the foregoing, Defendants, directly or indirectly, violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2].

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

## I.

Issue findings of fact and conclusions of law that Defendants committed the violations charged herein.

## II.

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure orders that temporarily, preliminarily, and permanently enjoin Defendants and their officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 17(a)(2) of the Securities Act.

**III.**

Enter an order directing Defendants, and each of them, to pay civil money penalties pursuant to Section 20(d) of the Securities Act.

**IV.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

Dated May 10, 2018.

Respectfully submitted,

/s/ Daniel J. Wadley
Daniel J. Wadley
Amy J. Oliver
Alison J. Okinaka
Attorneys for Plaintiff
Securities and Exchange Commission